**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **No.  25-CR-3360 MLG** |
| | § | |
| **SHELTON ATOLE,** | § | |
| | § | |
| **Defendant.** | § | |

**DEFENDANT'S SENTENCING MEMORANDUM**

The Defense submits this memorandum to aid the Court in determining a just sentence for Mr. Atole's actions. The Defense asserts that no further incarceration is necessary, desirable, or even productive towards accomplishing the goals of sentencing in Title 18 United States Code Section 3553(a). The Defense, quite reasonably, anticipates the United States will seek incarceration Mr. Atole as justified by the same laws; that the United States will assert Mr. Atole is a violent man; and that any non-incarceratory sentence demeans the victim's experience. The Defense does not seek to disprove Jane Doe's narrative by this pleading, but the Defense merely seeks to write those things that are known to be true and how those truths relate to the propriety of a non-incarceratory sentence in this case.

**I.    The Federal Government, the State of New Mexico, and the punishment of Indians.**

In *United States v.  Antelope*, 430 U.S. 641, 646-7 (1977), the Supreme Court ruled that the Major Crimes Act does not subject Indians to its provisions by virtue

of their racial status as Indians, but rather by the "unique status of Indians as a separate people with their own political institutions." (Internal Quotation Marks Omitted). The Supreme Court reasoned "respondents were not subjected to federal criminal jurisdiction because they are of the Indian race but because they are enrolled members of the Coeur d'Alene Tribe." *Id*. at 646. Supplementing this ruling, the Supreme Court clarified that "state law does not constitute a meaningful point of reference for establishing a claim of equal protection." *Id*. at 649 n.12.

Here, we have the state of things. Laws that apply to Indians and Indian Country do not regulate a particular racial group or the lands belonging to a particular racial group, rather those laws are ruled to have drawn political distinctions not racial ones. And state laws, that have a more limited jurisdiction for the same conduct as federal laws within the same state, are, apparently, an inappropriate basis for assessing whether the federal government is denying Native Americans the equal protection of the law. Building upon the body of law applicable to Indians the Tenth Circuit Court of Appeals, in *United States v. Begay*, 974 F.3d 1172, 1176-7 (10th Cir. 2020), ruled that Defendant's arguments were foreclosed under 18 U.S.C. 3553(a)(6) as to Native Americans receiving harsher sentences for assaults than other groups for no other reason that Native Americans are disproportionately subject to federal jurisdiction. However, the *Begay* Court did note that such a consideration could be relevant to other sentencing factors. And it is.

Punishing members of a "political group", such as Indians, more harshly for the same conduct than any citizen of the State of New Mexico by simply applying

federal jurisdiction may be an inappropriate consideration under subsection (a)(6), however, that same consideration is relevant to the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, while meting out a just punishment; (a)(2)(A); to afford adequate deterrence, and to protect the public from any further crimes of the defendant; (a)(2)(B)-(C); and to the kinds of sentences that are available; (a)(2)(3). The Defense proposes an objective means of determining how serious an offense is to the citizenry residing in any federal judicial district, is to look to how the citizens of the state, in which the federal district court sits, treats the same actions under its own laws.

The State of New Mexico has criminalized Mr. Atole's actions in this case depending on how the Court determines the severity of the injury. *See* N.M.S.A. §§ 30-3-5 (Misdemeanor) and 30-3-16 (C) (Third-degree Felony). In doing so, the State of New Mexico through its statutory laws has provided this Court a reference for how the citizens of New Mexico treat the seriousness of Mr. Atole's actions, the appropriate length of a sentence for those actions that promotes respect for the law while imposing a just punishment, and a punishment that provides adequate deterrence by protecting the citizens of New Mexico from any future criminal actions of the Defendant.

In the Defense's view, considering Jane Doe's injuries, the State of New Mexico would likely determine that Mr. Atole's actions qualify as a misdemeanor as the force involved in this case was not likely to cause death or great bodily harm. See e.g., N.M.S.A. § 30-3-5 (B). If that assessment is accurate, Mr. Atole would face

a basic jurisdiction of less than one year if he were to be charged and convicted in state court for the same acts. N.M.S.A. § 31-19-1 (A). An unintentional consequence of prosecuting Mr. Atole in federal court, because the Defense assumes the United States is not deliberately attempting to punish Indians more harshly than anyone else in the State of New Mexico that goes to state district court for the same criminal acts, is the results are unfortunately in-fact the same. Therefore, one of the many truths in this case is that our fellow citizen, Mr. Atole included, by virtue of their blood quantum as Indians, the location of the scene of the offense and their residence on Indian Pueblos and Reservations, and their political affiliations are subjected to harsher penalties and sentencing guidelines. Surely the impropriety of punishing any "political group" more harshly because of their immutable, uncontrollable, inalienable, and entirely coincidental characteristics of blood quantum, membership in a political group, and the offense occurring on a reservation or pueblo as opposed to city within the State of New Mexico is obvious.

Mr. Atole's federal prosecution and admissions to the charged offenses subject him to a much larger amount of jurisdiction. A violation of 18 U.S.C. § 113 (a)(7) is subject to imprisonment of up to 5 years. As a result, this Court not by virtue of the nature of Mr. Atole's acts, but by virtue of where they happened and the "political" identity of the Defendant and victim this Court now has 5 years of jurisdiction versus 364 days that would be available to a New Mexico District Judge.

The State of New Mexico in punishing Aggravated Battery as a full misdemeanor reflects a legislative judgment by the citizens of New Mexico that a maximum of 364 days of jurisdiction reflects the seriousness of the offense, promotes respect for State law all while imposing a just punishment for the offense. Notably, the fact that Mr. Atole would not face mandatory prison time in the State also reflects the judgment that his offense can be redressed through a non-custodial sentence. That is a judgment that the people of the United States also share as they have allowed for probation for Mr. Atole's actions under 18 U.S.C. § 3561(c)(1). For the same reason, a non-custodial sentence is a sentence that the people of New Mexico have determined is a potentially appropriate one in these circumstances that will deter the defendant and any others similarly situated from committing further criminal acts, and that will adequately protect the public. These values are admittedly unknowable in any case, rather state legislation is considered here because arguably it represents the judgement of the community in the State where the offenses occurred and thereby provides a more objective measure the seriousness of the offense, what sentence will promote respect for the law while also imposing a just punishment; that affording adequate deterrence, and adequately reflects the kinds of sentences that are available to this honorable Court. All of that is to say that a sentence of time served or any sentence that does not require further incarceration is appropriate here.

II.    **A sentence of incarceration in the Bureau of Prisons (BOP) is inappropriate as it is greater than necessary to achieve the goals of sentencing identified in 18 U.S.C. § 3553(a).**

The currently calculated guideline range contained in the PSR is 27-33 months. The defense has filed objections to that range. The defense is of the position that incarcerating a 35 year-old man for an additional two-years does not meaningfully advance any goal of sentencing. Lamentably, supervision and treatment cannot always ameliorate the psychological effects of incarceration.  If this Court imposes further incarceration and assuming Mr. Atole becomes a model inmate during that time, upon entering the BOP, Mr. Atole, like so many other men sentenced to prison terms, will need to learn to adapt to the culture and politics amongst inmates in addition to navigating the facility regulations.

There are foreseeable results of that process on any person, one such result is the process of prisonization also called institutionalization. The process of prisonization or institutionalization begins when inmates adapt to the external limits, rules, and regulations placed upon them by the penal system.  Such as when to eat, when to recreate, what to say on the phone, when to shower, where to work, what to do at work, and when to sleep. To be clear, such limits, rules, and regulations are necessary to operate any penal system, but it is equally clear that adaptation to them is not only desirable in the short term but potentially devastating in the long term.

Prisonization is a form of institutionalization whereby the evolution of personality traits or habits become oppositional or institutionally subversive. Prisonization is a form of "institutionalization" which connotes psychological changes that produce institutionally conforming and appropriate thoughts and

actions. The terms are often interchangeable as learned behaviors that help a person positively adapt to the prison environment become negative behaviors upon release. For example, accepting that many day-to-day decisions such as how to behave, when to shower, what to eat, and when to sleep are controlled not by the individual but by their jailors is simply part of adapting to prison life and an inherent consequence of any penal system. During incarceration and upon release, the atrophy of the ability to make rational self-determined behaviors that was beneficial during incarceration leads to a lessened ability to self-regulate while exposed to the many liberties outside of the penal system. A lessened ability to self-regulate is not desirable in many people, let alone someone convicted of a felony. The effects of the prisonization process suggests that a lesser sentence, adequately reflects the seriousness of Mr. Atole's admitted actions considering that Mr. Atole has remained incarcerated throughout this case. Doc. 16.

Mr. Atole recognizes he hurt Jane Doe. Mr. Atole has accepted his responsibility for those injuries and done so without the benefit of a plea agreement. Mr. Atole acknowledged Jane Doe suffered because of his actions. Because of Mr. Atole's actions in this case, he will be marked as a felon. That is a consequence apart from any additional period of incarceration. As a felon it will likely be far more difficult for Mr. Atole to find a job upon his release, to improve his situation through education, or to even rent an apartment. If the Court determines that more incarceration is necessary in this case, then the reality is that every additional day that Mr. Atole remains in custody is another day that delays Mr. Atole's

reintegration into his community. It is another day that Mr. Atole is not working at a job within his community, it is another day that Mr. Atole is not receiving counseling in his community, and it is another day that Mr. Atole is not seeking educational training in his community. It may be argued that there are substance abuse treatment programs, educational opportunities, and vocational training programs available in the BOP but there is evidence to question the quality, availability, and quantity of those programs that are truly available to anyone in the BOP.

The best evidence of why programming in the BOP may not be available in the amount, quality, or duration as previously offered are the persistent staffing shortages in the BOP, and the diversion of non-correctional officers into correctional officers posts through a process called augmentation. Recent history informs us that danger pervades the BOP not only because of staffing shortages but also by the introduction of contraband and the failure to maintain facilities. According to the Office of the Inspector General's Report on Top Management and Performance Challenges facing the United States' Department of Justice (DOJ) issued in 2024, persistent staffing deficiencies created a more dangerous environment for convicts and staff.[1]

---

[1] U.S. Department of Justice Office of the Inspector General, *Top Management and Performance Challenges Facing the Department of Justice-2024*, 1, (2024), https://oig.justice.gov/reports/top-management-and-performance-challenges-facing-department-justice-2024 ("These staffing, infrastructure, and contraband issues have seriously compromised the safety and security of staff and inmates.").

The Office of the Inspector General (OIG) over the last 20 years has released over 100 reports detailing the systemic issues facing the BOP.[2] A relatively new downstream issue from the staffing shortage is the use of non-correctional officers to work in correctional officer positions by a process called augmentation.[3] This process diverts resources from other parts of the facility including programming. Augmentation raises concerns about the efficacy of treatment opportunities if treatment providers are diverted into correctional officer posts. In addition to the increased economic burden of mandatory overtime, the primary concern raised by staffing shortages is the reduced ability to minimize the risk of inmate deaths.[4] The OIG identified the use of augmentation and mandatory overtime to compensate for staffing shortages as tending to overburden existing staff potentially causing inattentiveness to duty, decreased vigilance, and sleep deprivation.[5] For these reasons, the availability of staff to carry out educational, vocational, or treatment programs is not guaranteed and subject to serious doubts. That situation also raises concerns about the duration and quality of training, treatment, or education that inmates receive in the BOP. In short, the treatment, training, and education options available to inmates in the BOP are also available to those on supervised release or probation within the State of New Mexico. Title 18 United States Code, Section 3553(a)'s statutory command is that the sentence must be sufficient but not greater

---

[2] *Id.*
[3] *Id.* at 2.
[4] *Id.*
[5] *Id.*

than necessary to accomplish the goals of sentencing. The Defense seeks a sentence of time served because the amount of incarceration Mr. Atole has served is sufficient to accomplish the relevant goals of sentencing and the quality and quantity of any treatment, educational, and vocational treatments available within the BOP are equally if not more available outside of the BOP.

### III. The treatment that Mr. Atole wants and needs is available to him outside of the BOP.

Mr. Atole, the man that will stand before the Court at sentencing, is a man whose father died by suicide when Shelton was one-year old. Shelton's mother struggled with alcohol during his childhood, and he was there to witness those incidents and the consequences thereof. People have died in Mr. Atole's family due to alcohol abuse. Shelton, during his childhood, had to go live with his grandmother while his mother was in the depths of her alcohol addiction. As a result, a stable home life, with the assistance of two loving and supportive parents is not what Mr. Atole had growing up. As the Presentence Report (PSR) adequately notes, Mr. Atole's childhood was far less supportive than that. Nevertheless, Mr. Atole describes his childhood as good and free of abuse.

Then we look to the PSR's family data. We see Mr. Atole's family members falling victim to murders, car crashes, COVID-19, and overdoses. Shelton admitted his problems with alcohol played a part in his behavior that brought this case about. And with that family history of deaths and struggles with alcohol, it is worth considering and ordering treatment for alcohol consumption and other substances.

10

The propriety of substance abuse treatment is confirmed by Mr. Atole's drug use and criminal history as documented in the PSR.

Respectfully Submitted,

**FEDERAL PUBLIC DEFENDER**
111 Lomas Blvd. NW, Suite 501
Albuquerque, NM 87102
(505) 346-2489 | (505) 346-2494 Fax
Martin_Juarez@fd.org

***Electronically filed April 28, 2026***
/s/ Martín Juárez
Assistant Federal Public Defender
Attorney for Mr. Atole